HEARD APRIL TERM, 1871.

## MASSOT vs. MOSES.

A, being seized in fee of a tract of land, in consideration of $2,000, granted to B "the right and privilege of entering in or upon, by himself or his agents, all or any part" of said tract, "for the purpose of searching for minerals and fossil substances, conducting mining operations to any extent" he "may deem advisable, and for working, removing, selling and appropriating" to, his own use, "for the term of ten years from," &c., "all ☀ ☀ ☀ phosphates that may be found on, by any person or persons, or contained in, any part" of said tract; provided that B "shall not, at any one time during" said term, "engage in working over one-third part" of said tract; such one-third part to be selected by him as often as he may desire. The deed also contained grants to B of the right to cut and remove trees and wood—such trees and wood to remain the property of A—and of a general right of way, with the privilege of constructing railroads and other roads and machinery, to be used in the transportation, manufacture, &c., of said substances, with the right to remove the same at the expiration of the term: *Held*, That this was a demise of the phosphate beds for the term of ten years, with the exclusive right of raising, selling, disposing of, and manufacturing all phosphates found during the term, and that B had the right to divide his interest and convey part of it to others.

The expression "that may be found by any person or persons, or contained in any part" of the land, distinguishes this case from *Lord Mountjoy's*, Co. Litt., 165, and shows an intent to convey an exclusive right, and not one in common merely with the grantor; and this construction is aided by the fact that the consideration was an entire sum demandable at the delivery of the deed, and intended as compensation for the right granted.

The principal cases on the subject reviewed, and the principles deducible from them stated.

Unopened veins or beds of minerals contained in and below the surface of the soil may be demised as if they were separate pieces of land.

A grant, for a term of years, of the exclusive right to search for, take, sell and dispose of, to the grantee's use, all phosphates found during the term in a designated tract of land, is a demise of the beds or veins of phosphates contained in the land.

BEFORE GRAHAM, J., AT CHARLESTON, APRIL, 1871.

This was a bill in equity exhibited in January, 1870, by Horace Massot, plaintiff, against O. A. Moses, W. L. Bradley and C. C. Coe, defendants.

The bill alleged that on the 24th April, 1868, the plaintiff was seized in fee of a plantation in Charleston County containing one hundred and thirteen acres of land, in, upon, or under which, there were certain veins or beds of phosphate rock of great value; that on the day and year mentioned, the plaintiff entered into an agreement with the defendant, Moses, whereby, in consideration of the sum of $2,000, he granted, sold and conveyed unto the said Moses, "his heirs, executors and assigns, the right and privilege of entering, by himself and his agents, in and upon all or any part of the said tract of land, for the purpose of searching for minerals and fossil substances and conducting mining operations, to any extent the said Moses might deem advisable, and for working, removing, selling,

using and appropriating, as the property of the said Moses, for the term of ten years, all organic or unorganic minerals, rocks, fossils, marls or so-called phosphates that might be found on, by any person or persons, or contained in, any part of the said plantation," which said privilege was, however, subject to the proviso, "that the said O. A. Moses should not, at any one time, during the aforesaid term of ten years, engage in working over one-third part of the said tract. The third to be so worked to be selected by the said O. A. Moses, and such selection to be made as often as the said O. A. Moses might desire."

That immediately after the execution of the said agreement, the defendant, Moses, entered upon the said land, and commenced mining for phosphates thereon, and has continued to do so to the present time, and has erected offices, houses and other buildings on said land; that, in November or December, 1869, he, the said Moses, granted to the defendants, Bradley and Coe, the right to dig and mine, for a long term of years, upon so much of the said plantation as lies to the west of the North Eastern Railroad track, and bound them to pay him one dollar per ton for all phosphates dug by them, and to dig not less than 5,000 tons per annum; that the said Bradley and Coe have entered upon said plantation under their said agreement with Moses, and are prosecuting mining operations thereon, and have dug therefrom large quantities of phosphates, and sold the same; that the said Moses is about to open fresh mines upon that part of the said tract lying to the east of the North Eastern Railroad track, and work the same for his own benefit.

The bill charged that the assignment by Moses to Bradley and Coe was illegal, and a fraud upon the plaintiff, and extinguished all his right and interest in said tract of land, and that the plaintiff was entitled to an account of all the phosphates dug by the defendants on said tract, and the profits and produce thereof; and it prayed that an account be taken of all such phosphates, and of the proceeds of the sales thereof, and that the defendants be enjoined from working the mines in said land.

The defendant, Moses, filed an answer and demurrer, and the defendants, Bradley and Coe, an answer and plea to the bill.

On July 1st, 1870, an order, by consent, was made, appointing I. W. Hayne, Esq., referee in the cause, and referring it to him to hear and determine all the issues therein; and on the 26th day of the same month and year, he made his report, as follows:

A bill of complaint was filed in this case on the 25th January, 1870, under the old system of pleading, in the Court of Common Pleas for Charleston County, on the equity side. On the 23d February, an answer and demurrer were filed by Ottolengui A. Moses, and an answer and plea by W. L. Bradley and C. C. Coe. A question was raised at the hearing as to the extent and effect of the demurrer—the plea seemed to have been lost sight of.. Ultimately, however, it was expressed as the desire of all parties, that the case should be decided *on its merits*, without regard merely to technical points of pleading. I proceed, therefore, at once to the case as presented by the evidence and the admissions of the parties. Horace Massot is now, and on the 24th April, 1868, and long anterior thereto, was seized and possessed of a tract of land in Charleston County, containing about one hundred and thirteen acres, and more particularly described in an instrument to which I shall presently refer. On the day and date above specified, the said Horace Massot joined with Ottolengui A. Moses in a deed of indenture, wherein the said Horace Massot " of the first part," in consideration of $2,000 cash, "granted, sold and conveyed," to A. O. Moses, " of the second part," to him, " his heirs, executors, administrators and assigns, the right and privilege of entering in and upon, by himself and his agents, all and every part of said lands," for the purpose of "searching for mineral and fossil substances, conducting mining operations to any extent," and "for working, removing, selling," and, as his property, " to use and appropriate, for the term of ten (10) years," all the minerals, phosphates, &c., " that may be found or contained in any part " of said land. It was contended, on the part of the plaintiff, that the instrument admitted to be a deed of grant was, in effect, a *license* merely, and " granted, sold and conveyed " not a tangible estate, either real or chattel, but simply an interest in the nature of an *"incorporeal hereditament."* It was admitted that the license was irrevocable, and that such an interest was *assignable*, but it was insisted that it was a necessary incident to such an interest that the assignment should be *entire*, and that an attempt to divide the interest was in derogation of the rights of the original grantor, and worked a forfeiture or *extinguishment* of the " right and privilege " of the party attempting the division. On the other hand, it was contended, on the part of defendant, that the indenture of the 24th April, 1868, " granted, sold and conveyed " the phosphates themselves, and that the thing conveyed was tangible and corporeal, and the indenture gave an interest

which, during the term of ten (10) years, could be disposed of in all respects as property, and might be divided to any extent the owner pleased. The result of the case turns upon the construction of the deed. The gravamen of the complaint, and the only matter insisted on in argument, is the transfer by O. A. Moses of a *part* of his interest (whatever the nature of that interest might be) to *Bradley*, whose agent C. C. Coe is, as well as one Gildersleeve, and the fact that Bradley, through these and other agents, has, *under an agreement with Moses*, set up on complainant's premises, phosphate works *separate* and *distinct* from those worked by Moses.

In terms the deed conveys only a "right and privilege of entering" the premises of complainant for certain specified purposes. Among these "purposes" are the "working, removing, selling," and, as his "property, to use and appropriate," "for the term of ten years," the phosphates, &c., "which may be found," or are "contained in any part of all that plantation." There is, it is plain, no *direct* conveyance of a mine or mineral, or phosphates, or of anything *corporeal*. The conveyance is, as I have said, of a "right and privilege." But in analogy to the familiar doctrine cited from Coke by the counsel for defendants, that a grant of the *profits* of land carries the land itself, I was at first inclined to hold that the grant of "the *right*" to take as his property" the phosphates "contained in any part of all that plantation," carried the *phosphates themselves*. In the case of *Stewart* vs. *Garnett*, 3 Sim., 398, it was decided that a devise of the rents and profits of a plantation in Jamaica gave an absolute property, in not only the land, but the slaves, stock, planting implements, &c. The Vice Chancellor says "the devise of the rents, issues and profits of the estate is the same as a devise of the *estate itself*." The counsel for complainant seemed to think that the grant being but for a term of years would make a difference. But the case of *Legard* vs. *Hodges*, 3 Brown Ch. Rep., 531, was a pledge of profits not perpetually, but until £10,000 should be paid.

After a thorough examination, however, of the authorities cited by counsel for complainant, I have been constrained to yield this pre-possession, and, in view of the consequences which follow, *I add that I yield most reluctantly.*

The case of Lord Mountjoy, as reported by Lord Coke, near three hundred years ago, reads as follows :

"The Lord Mountjoy, seised of the manor of Canford in fee, did by deed indented and enrolled, bargain and sell the same to

Browne in fee, in which indenture this clause was contained : Provided, always, and the said Browne did covenant and grant to and with the said Lord Mountjoy, that he, his heires and assignes, might dig for ore in the lands (which were great wasts) parcell of the said manor, and to dig turfe, also for the making of allome. And in this case three poynts were resolved by all the Judges. First—that this did amount to a grant of an interest and inheritance to the Lord Mountjoy to digge, &c. Secondly—that notwithstanding this grant, Browne, his heires and assignes might dig also, and like to the case of common *sauns nombre.* Thirdly—that Lord Mountjoy might assigne his whole interest to one, two or more, but then if there be two or more, they could make no division of it, but worke together with one stocke; neither could the Lord Mountjoy, &c., assigne his interest in any part of the wast to one or more, for that might work a prejudice and a surcharge to the tenant of the land."

The terms of the deed in that case, as given by Anderson, J., who presided at the trial, are as follows :

Lord Mountjoy " did license and authorize Richard Leycole, for and during the term of 31 years next, to search, open, dig, cast up and work for all manner of mines, minerals, mettals, liquors and commodities whatsoever, in any of the mines, minerals and possession whatsoever, of the said manor, and the same to convert to his use during the said term, yielding therefor yearly to the Lord Mountjoy the full moiety or one-half," &c.

*Doe* vs *Wood*, Barn. & A., 2, 724, decided in King's Bench, in 1819, is equally explicit. This was a grant to A. and his " partners, fellow adventurers, executors, administrators, and assigns, of free liberty, license, power and authority to dig, work, mine, and search for tin, tin ore, &c., and all other metals and minerals whatsoever," and the same " there found " to " dispose of to their own use," for the term of twenty-one years. Chief Justice Abbott held that this deed operated " as a license merely." He says, " the purport of the *granting part* of this indenture, is to grant, for the term therein mentioned, a liberty, license, power, and authority to dig," &c., " throughout the lands therein described, and to dispose of the ore to the use of the grantee, his partners, &c. " That is," he continues, " no more than a mere *right* to a personal chattel when obtained, in pursuance of *incorporeal privileges,* granted *for the purpose of obtaining it.*" This case cites and confirms Lord Mountjoy's case, decided 200 years before. The case of *Cheatham*

vs. *Williamson*, 4 East, 469, decided in 1804, is likewise cited and approved. It is in the latter case that Lord Ellenborough says that no case can be found where one who has only a liberty of digging for coals in another's soil has an exclusive right to the coals, so as to enable him to bring trover against the owner of the estate for coals raised by him, and Lord Ellenborough recognizes Lord Mountjoy's case as authority, and declares it decisive of this point. He adds that "those who compared it to a grant of common *sauns nombre* used that as the strongest instance to show that it could *not* be an *exclusive right.* In the case of *Grubb* vs. *Bayard*, 2 Wallace, Jr., Reports of cases in Circuit Court of the United States, in Pennsylvania, Justices Grier and Kane presiding, the effect of the following deed was considered: "And the aforesaid David, for himself, his heirs, executors, and administrators, doth covenant, promise, grant and agree to and with the aforesaid William, his heirs and assigns, that he, the said William, his heirs and assigns, shall and may, from time to time, and all times hereafter, dig, take and carry away all iron ore to be found within the bounds of the said David's tract of land, containing 282 acres, provided he, the said William, his heirs and assigns, pay unto the said David, his heirs or assigns, the sum of sixpence (Pennsylvania currency,) per ton, for every ton taken from the premises of 282 acres aforesaid."

Of this deed in a former case before the Supreme Court of Pennsylvania, Judge Roberts had said, "it is a grant of twenty acres of land in fee simple, and also a grant of an incorporeal hereditament, for a distinct and different consideration, in the remaining part of the tract of two hundred and eighty-two acres. The right to raise ore is an *incorporeal hereditament,* granted for a valuable consideration, and *is not,* as has been contended, a *license revocable at the will of the parties.*" The point, was distinctly made in argument, that "the words were essentially different from those in Lord Mountjoy's case." "How," counsel asked, "can one man dig, take and carry away, all iron to be found," within a certain tract, "consistently with the same right in another man?" The grant, it was claimed, on this difference, *excluded* any concurrent right to dig on the part of the owner of the soil. It was decided otherwise, and decided, further, that it could not be divided or apportioned. Judge Grier, in his separate opinion, expresses himself as follows:

"A right or privilege to dig and carry ore from the land of another is an incorporeal hereditament—a right to be exercised on the land of another. It is a license, irrevocable, when granted

on sufficient consideration. It may be demised for years or granted in fee; it is assignable. The grantee or assignee of such a license, right or privilege, to be exercised in the land of another, has no such title to the ore that he can support trover against the owner of the land, for ore or coal raised by him. On this subject, I may adopt the words of Lord Tenterden in one of the cases relating to mines quoted at the bar. This indenture, in its granting part, does not purport to demise the land or the metals, or the minerals therein comprised." Again, he says, " is the right granted, one that is exclusive of the owner of the soil? Much stress has been laid upon the word ALL in this grant, as having the effect of making it exclusive. But so important a restriction cannot be deduced from so equivocal an expression. The deed has been drawn up by a very able conveyancer. He seems to have had *Lord Mountjoy's* case in his mind at the time. He employs none of the apt and well known terms or phraseology to indicate an intention of giving an exclusive right as against the grantor himself. The grant of a right to dig, take and carry away ' all' iron ore to be found within the bounds, &c., shows the extent of the license but not its exclusiveness. The grantee may dig, take, &c., of any or all the ore he can find on the land, but he has no exclusive right in *any* of it till he *finds* it and *digs* it. It is a right without stint as to quantity, and *Lord Mountjoy's* case likens it to the grant of a right of common *sans nombre* which does not exclude the owner. This is a point decided in *Lord Mountjoy's* case as reported by Coke, Leonard and Godbolt."

On a subsequent day, Judge Grier, speaking for the Court (himself and Judge Kane) says: " We decide that the thing granted is *not* the iron ore contained in the land of defendant; but an incorporeal hereditament, a right, or license or liberty, well described in the plaintiff's declaration as a ' right and privilege to dig, take and carry away,' all or any iron ore to be found in the land of defendant. It is a license irrevocable, which may be demised for a term of years, or assigned in fee. * * * * * * *
That the effect of the word ' all' in this grant is not to give an exclusive right *as against the grantor.* It describes the *extent* to which the license may be exercised, not its exclusiveness. It is a grant of a right to take ore without stint, and is aptly compared to a right of common in gross *sans nombre,* which does not exclude the lord or owner of the land out of which it is granted. That such a right is *indivisible,* and unless the plaintiff, as assignee, is clothed with the

whole, he has nothing, *and cannot support this suit as against the owner of the land."*

" And, lastly, that the case of the Lord Mountjoy as reported by several authoritative reporters, and among them by Lord Coke in his Commentary, is directly in point on both parts of the case, and rules it. Its authority has never been questioned; and the application of its doctrines to this case results in a conclusion which accords with our reason and our sense of justice."

I cannot, in the same cordial terms with Judge Grier, express the " *accord*" of my own mind with the conclusions arrived at.

To my mind there is a clear distinction between common of pasture, and of estovers and piscary, and a right to *mine*. The pasture is to be *used* by the *commoner's cattle*, and the wood to be *burned* by the *commoner* or his *household*; even the fish were expected to be *consumed;* but ores, minerals and phosphates are essentially *articles of sale*, and the supply may be indefinitely extended. The capital invested in the enterprise, much more than the number of assignees, regulates and controls the amount of the minerals removed. The " surcharge," it seems to me, in case of a mine, is very much of a fiction. I go further; this very case shows that all considerations of expediency and public policy are with the defendants.

Mr. Massot, it appears, has had, according to the argument of his counsel, (sustained, I think, by the authorities adduced) a *concurrent* right to dig and sell phosphates with Mr. Moses, even on the one-third to which the license of Moses extends. There is, it will be remembered, a proviso in the deed that Moses should not work more of the land than one-third, at any time. And the counsel of the defendant seemed to concede that as to the other *two-thirds* of the tract the complainant had, and still has, such right. Why has the right never been exercised by complainant? Mr. Moses, on the contrary, has pursued his own mining, we presume, with profit, and has made an arrangement with Mr. Bradley, sub-licensee, by which he, Moses, is to receive $5,000 a year, and leave, I presume, a large margin of profit for Mr. Bradley, in addition. These contracts and sub-contracts, it strikes me, benefit the community by stimulating enterprise. As to the original grantor, if his whole grant, which is admitted to be *assignable,* had been assigned absolutely, *as he had a conceded right to do,* to some ONE *great capitalist* or some ONE *rich corporation, in what respect would Massot's condition be bettered thereby?*

But, sitting in the exercise of judicial functions, I must adminis-

ter the law as I find it, and the cases, in my judgment, are conclusive as to the points stated below; and the inconveniences and hardship arising from this construction, if it does not in fact express what was the intention of the parties at the time of the deed, may, at all times, be obviated by the insertion of a few additional words in the granting part of the deed. Let the grant be of the minerals and phosphates themselves, followed by the right to dig, &c.

1. That the indenture of the      day of      entered into by Ottolengui A. Moses and Horace Massot, conveys no property in the phosphates contained in the land, but merely a "right and privilege," to dig, use and sell them.

2. That this right and privilege is not *exclusive* in Moses, but to be enjoyed by him *concurrently* with the same "right and privilege" belonging to Massot as the owner of the soil.

3. That even if the "right and privilege" were *exclusive*, they are in their nature *incorporeal*.

4. That though it may not be true, universally, that *all* incorporeal hereditaments are incapable of division or apportionment, yet it is true that a right to *dig, use and sell minerals*, unaccompanied by a grant of the minerals themselves, cannot be divided or apportioned; and that though assignable, the assignment must be entire, and of a single interest.

5. That an attempt to assign *in part*, or to assign *several separate* interests, is illegal, and the *contract void*.

6. If necessary, I should be compelled to hold, further, that, at law, the attempted assignment of a divided interest by Moses *extinguished* his right.

It is quite a relief, however, that I am not called on to decree under the principle last announced. The principle of extinguishment, as applied to mining licenses, does not enlist the sanction of my judgment, and is utterly opposed, I think, to the equities of this case. I do not consider the principles of equity as abolished by the New Code of Procedure. There may arise cases when it will be difficult to say whether a suitor seeks redress in *equity* or at *common law*. But this, beyond all question, is an equity case, and equity will *not* decree a *forfeiture*. The complainant will have had all the redress which, in my opinion, he could in equity demand of Moses, when his licensee, the said Moses, turns over to him the amounts received by him under the void assignment to, or contract with, the sub-licensee Bradley. To that extent I feel constrained

to go, as to defendant Moses. The contract with Bradley being illegal and void, he, of course, must cease to work under it. Such must be my decree as to him. I should be pleased to stop with an order enjoining and restraining the defendant, Bradley, and his agents, from further operations. But Massot was no party to the contract between Moses and Bradley, and he has, I think, a right to an account from Bradley of his profits, with a view to fix a proper *compensation* for the use of the phosphates, since he, Bradley, has been at work. It may be that the amount of reasonable compensation would exceed the sum agreed to be paid to Moses. If so, complainant is entitled to the excess.

It is ordered, adjudged and decreed, that the defendant, Ottolengui A. Moses, do account before
hereby appointed referee for the purpose, for all amounts of money or other thing of value received by him, his agents or assigns, for or on account of any agreement with W. L. Bradley, C. C. Coe, or any other agent or employee of the said Bradley, for digging phosphates on the lands of Horace Massot, by the authority, license or permission of the said Ottolengui A. Moses, and that said amounts being ascertained, the said O. A. Moses pay the same to the complainant.

It is further ordered, adjudged and decreed, that W. L. Bradley and C. C. Coe, defendants, appear before said referee and give full information as to the extent of their operations under the agreement with the said O. A. Moses, of the value of services rendered and labor bestowed, and of their net profits, for the purpose of enabling the referee to determine whether any additional compensation, and if any, how much, is due to complainant for and on account of their operations under the void license aforesaid.

It is further ordered, adjudged and decreed, that the said W. L. Bradley, C. C. Coe, and all other persons acting under their authority, be, and they are hereby, restrained and enjoined from all further mining or phosphate operations on the premises of the complainant, or from otherwise trespassing thereon.

It is ordered, that defendants pay the costs of this suit.

It is ordered, that the parties have leave, either in Term time or at Chambers, to apply at the foot of this decree for such further orders as may be necessary to carry said decree into effect.

The plaintiff excepted to the report, on the grounds:

1. That the right granted to Moses, being essentially integral

and indivisible, was entirely extinguished by his grant to his co-defendants of a license to mine a part of the plaintiff's land.

2. That the right of the defendant, Moses, having thus been extinguished, he was, from the time of such extinguishment, a mere trespasser, and the plaintiff was entitled to an injunction against him, upon the ground that his further mining would be an irreparable damage to the plaintiff's property; especially as it is alleged in the bill and admitted by the demurrer, that he "is a man of small means," and "that a judgment recovered against him would be of little or no value."

3. That the principle, that equity will not enforce a forfeiture, is applicable only to forfeitures created by agreement of parties, and not to forfeitures created by law.

4. That the Court having jurisdiction for the purpose of restraining Coe and Bradley from mining the complainant's land under the license granted to them by the defendant, Moses, will, to avoid multiplicity of suits, go on and do complete justice between all parties to the proceedings.

5. That the Code now of force in this State abolishes all distinctions between law and equity, and the referee, selected by consent, instead of a jury to try this case, was as strictly bound to decide it according to the rights of the parties, as a jury would have been.

6. That even admitting that this Court would not enforce the strict right of complainant, without trial by jury, still complainant was entitled, pending such trial, to an injunction against O. A. Moses, who, according to the facts found by the referee, is a mere trespasser, taking away the very substance of the complainant's property.

7. That the said referee should have ordered the said O. A. Moses to account for the value of all the phosphates dug by him since the extinguishment of his right to mine upon the land of the complainant.

The defendants also excepted to the report, on the grounds:

1. Because, under the provisions of the deed, executed on the twenty-fourth day of April, eighteen hundred and sixty-eight, the plaintiff, by his conveyance to the defendant, O. A. Moses, his heirs, executors, administrators and assigns, of the right and privilege of entering in and upon, by himself or his agents, all or any part of the tract of land therein described, for the purpose of searching for mineral and fossil substances, conducting mining

operations to any extent he might deem advisable, and for working, removing, selling, and, as his property, to use and appropriate, for the term of ten years, all organic or inorganic minerals, rocks, fossils, marls, or so-called phosphates that might be found on, by any person or persons, or contained in any part of the said tract of land, conveyed the title to the organic or inorganic minerals, rocks, fossils, marls, or so-called phosphates, in the said tract of land, and not a mere license or incorporeal right or hereditament, and by terms of the said deed the said O. A. Moses is entitled to the exclusion of the plaintiff to mine on the said tract of land during the period of ten years.

2. Because, under the said deed, any assignment by the said O. A. Moses of the right to mine any portion of the said tract of land is not invalid or illegal, but such assignment is in accordance with the rights and powers vested in the said O. A. Moses under the same.

3. Because the plaintiff is not entitled to any account from the said defendant, O. A. Moses, for any part or portion of the minerals dug on the said tract of land, and the judgment of the said referee, whereby the said account against the said defendant, O. A. Moses, and an injunction against the defendants, W. L. Bradley and C. C. Coe, is ordered, is erroneous, and should be set aside, and the bill should have been dismissed against all the said defendants.

His Honor the presiding Judge having heard the case on the pleadings, report and exceptions, ordered that the exceptions be overruled, and that the report be confirmed as the judgment of the Court.

Both sides appealed to this Court, the grounds of appeal being the same as the exceptions to the report.

*Dingle, Pressley, Lord and Inglesby,* for plaintiff, contended:

I. That the deed of 24th April, 1868, granted to Moses the right to dig on the premises described therein for phosphates, but conferred no property or estate in the phosphates themselves until severed from the soil. It was a sale, therefore, of such phosphates only as were raised during the term, and conveyed to Moses an incorporeal and not a corporeal hereditament.—Collier on Mines, 4 Law Lib., 6th Series, 1, 15, 111; Bainbridge on Mines, 156, 710, 733, 300; Bac. Abr., Leases, K; *Doe* vs. *Wood*, 2 Barn. & Ald., 731; *Cheatham* vs. *Williamson*, 4 East., 469; *Norway* vs. *Roe*, 19 Ves., 158;

*Grubb* vs. *Bayard*, 2 Wal., Jr., 81; *Funk* vs. *Haldeman*, 53 Penn., 229. The deed, therefore, was not a lease but a license.

II. That the license conferred upon Moses was not exclusive of the plaintiff's right to dig for and take phosphates from the premises. Collier, 9; Bainbridge, 308; *Lord Mountjoy's* case; *Johnston Iron Company* vs. *Cambrice Iron Company*, 32 Penn., 241; *Glowinger* vs. *Franklin Coal Company*, 55 Penn., 1; *Clark* vs. *Way*, 11 Rich., 624; 2 Bl. Com., 20; Smith on Real Prop., 4; *Caldwell* vs. *Fulton*, 31 Penn., 475; *Clement* vs. *Youngman*, 40 Penn., 341, and cases cited on first point.

III. It is contended that the grant to Moses, though a license, was irrevocable and assignable, but we insist that the contract between Moses and Bradley and Coe, was not an assignment of an existing interest, but the creation of a new interest—a license from Moses to Bradley and Coe.—Tayl. L. and T., §§ 426, 429, 431.

IV. That the incorporeal hereditament granted to Moses, though assignable, was indivisible, and by attempting to sever it Moses has destroyed it. See cases cited above, and *Leymen* vs. *Abeel*, 16 Johns. R., 30; *Van Russelear* vs. *Radcliffe*, 10 Wend., 639.

Cases were also cited upon the plaintiff's second and third grounds of appeal, which are not given, as those grounds were not considered by the Court.

*Buist,* for defendant Moses: The deed of 24th April, 1868, is substantially a lease for ten years of the minerals in the land. It is a grant of a corporeal right, and cannot be properly construed to be the grant of a mere license or incorporeal hereditament.—Crabbe Dig. Real Property, § 1,281; *Jackson* vs. *Harson*, 7 Cowan, 326; *Jackson* vs. *Kessewank*, 10 Johns. R., 336; Shep. Touchstone, 86; 3 Bac. Abr., 393; *Moore* vs. *Fletcher*, 16 Maine, 63; *Crosby* vs. *Bradley*, 20 Maine, 61; Bac. Abr. Leases, K; 2 Washb. on Real P., 345; 1 Washb. on Real P., 12, 270; *Stewart* vs. *Garnett*, 3 Sim., 398; *Legard* vs. *Hodges*, 3 Bro. Ch., 441; Co. Litt., 46; *Parker* vs. *Plummer*, Cro. Eliz., 190; *Queen* vs. *Winter*, 2 Salk., 588; *Paramour* vs. *Yardley*, Plow., 539; *Throgmorton* vs. *Tracy*, Plow., 145; Col. on Mines, 5; *Stoughton* vs. *Leigh*, 1 Taunt, 403; *Adams* vs. *Briggs Iron Co.*, 7 Cush., 361; Yale on Cal. Min. Claims and Wat. Rights, 215; *Cary* vs. *Daniels*, 5 Metc., 236; *Seaman* vs. *Vaudrey*, 16 Ves., 389; 1 W. Bl., 482; *Muskett* vs. *Hill*, 5 Bing. N. C., 694; *New Jersey Zinc Co.* vs. *New Jersey Frank. Co.*, 13 N. J. Eq., 322; *United States* vs. *Gratiot*, 14 Pet., 526. He also cited the Pennsylvania cases cited on the other side at great length.

Moses had the right to divide his interest and assign part of it to others.—2 Story Eq., §§ 1,039, 1,040; 12 Petersd. Lit. Leases, 2 Story Eq., §§ 1,050, 1,051.

He also cited *Ricketts* vs. *Bennett*, 50 Eng. C. L. R., 695; *Dickenson* vs. *Valpy*, 10 Barn. & C., 41; *Hautayne* vs. *Bourne*, 7 M. & W., 595.

*Memminger, Corbin,* for defendants.

Dec. 7, 1871. The opinion of the Court was delivered by

WILLARD, A. J. In the decision below, and in the argument at the bar, an important feature of this case has not received the attention due to the importance of its bearing. The line of argument pursued assumes that the question, whether the defendant, Moses, acquired under the grant of Massot an exclusive right as against the grantor, to the minerals contained within the premises described, for the period of ten years, is to be decided by first determining whether the thing granted was in its nature corporeal or incorporeal. It is contended that the grant created, at most, either a mere license, or an incorporeal hereditament, and authorities are cited to show that in such cases the grant does not include the right of the grantor to exercise, concurrently, a similar right to that conferred by his grant or license. The objection to this line of argument is, that it lays too great stress on the technical import of the words of conveyance, and gives too little attention to the actual intent of the parties, as evidenced by the entire instrument. The true inquiry is, what, from the construction of the whole instrument, was the nature of the right, power or property intended by the parties to be vested in the grantee ? Having ascertained, from this source, the nature of the thing granted, it will not be difficult to ascertain whether it is corporeal or incorporeal, nor to find the technical terms appropriate to describe such interest.

The instrument in question is, in form, a deed, signed, sealed and witnessed as such. Massot, in consideration of $2,000, grants, sells and conveys to Moses, his heirs, executors, administrators and assigns, " the right and privilege of entering in and upon, by himself or his agents, all or any part of. the land hereinafter described, for the purpose of searching for mineral and fossil substances, conducting mining operations to any extent the said party of the second part may deem advisable, and for working, removing, selling, and, as the property of the party of the second part, to use and appropriate, for the term of ten years from the date of these presents, all organic or

inorganic minerals, rocks, fossils, marl, or so-called phosphates, that may be found on, by any person or persons, or contained in, any part of all that plantation or tract of land," &c. Moses is further to have the right to cut and remove trees, wood and timber, when he shall deem it advisable and advantageous, such trees, wood and timber to remain the property of Massot, who is to have the disposal and profit thereof.

The deed contains the following proviso: "*Provided, further,* That the party of the second part (Moses) shall not, at any one time during the aforesaid term of ten years, engage in working over one-third part of the said tract, the third to be worked to be selected by the party of the second part, and said selection to be made as often as the party of the second part may desire." The deed further conveys, for the like period, a general right of way, with the privilege of constructing railroads and other roads, and machinery, to be used in the extraction, preparation, manufacture and transportation of the organic and inorganic substances in question, with the right to remove the same at the expiration of the term aforesaid.

What distinguishes this grant from that in *Lord Mountjoy's* case, (Co. Litt., 165,) and in all the other cases relied on as decisive against the exclusive nature of the grant, is contained in the expression " that may be found on, by any person or persons, or contained in, any part," &c. The term, "any person," must be regarded as including the grantor, so that if the grantor, in an attempt to exercise the same right as that conferred, should find any such substances upon the premises described, such act of finding would complete the title of the grantee or his assigns to the substances so found under the express terms of the grant. It might, perhaps, be said that this applies only to substances "found on," but not those " contained in " the premises. This construction cannot prevail, for it would contravene the general intent of the instrument. It is clear that, as to some part of the minerals, the right of the grantor is excluded, and to that extent something more than a right in the nature of common is conveyed.

How far, then, does this exclusion extend? It is evident that the parties did not intend to make a distinction, as to the character of the grantee's title, between the minerals lying on the surface of the ground and those contained within it. Such a distinction would be inconvenient and senseless. If, then, it was intended that the grantee should have the same right in respect to the one class as to the other, the particular expression under consideration must be re-

garded as characterizing the grantee's right, as to the whole, as exclusive of the grantor and all other persons.

This view is aided by the fact that the consideration of the deed was an entire sum of money demandable absolutely under the deed, and which may be assumed to include a valuation, fixed by the parties, on all minerals that the grantee was authorized to remove from the premises, and might, by possibility, remove therefrom during the term of ten years, and by the further fact that the deed, by its terms, professed to sell and convey the material itself, as well as the right to search for and take it.

It is not necessary to rest this case upon the whole ground taken in *Caldwell* vs. *Fulton*, 31 Penn., 475. In that case the grant was held to exclude the grantor on the ground that the consideration, being an entire sum paid for the right conferred, evidenced an intent to sell the whole mineral content as such. Independent of the character of the consideration, the language of the grant, in *Caldwell* vs. *Fulton*, was substantially the same as that in *Lord Mountjoy's* case. The opinion in *Caldwell* vs. *Fulton* does not seek to unsettle the authority of *Lord Mountjoy's* case, but finds grounds of distinguishing the cases, in the fact that different inferences are to be drawn, as to the intended exclusiveness of the grant, from the respective considerations in the two grants.

In the case before this Court, the construction of the grant does not depend wholly on the character of the consideration, as we have already seen. It is, however, a circumstance in the case, and, therefore, it is in place to enquire, whether the fact that the consideration is an entire sum demandable at the delivery of the deed, and intended as compensation for the right granted, tends to show an intent to convey an exclusive interest.

Apart from the limitation of ten years, if the subject-matter of the grant had been personal property, instead of land, it would have passed an exclusive right of property to the grantee.

A bill of sale for a valuable consideration, paid of all the goods of a certain kind in a certain warehouse, or all the quarried stone or mined ores, in a certain field, would show an intent to transfer a perfect title. Should the vendor, at the same time, confer a license upon the purchaser to enter upon his premises, and to search for, and remove the property, its effect would be to enlarge still further the right of the purchaser.

Although the subject-matter of the contract be land, still, if capable of severance, so as to become personal property, the parties are

not precluded, by any rule of law, from treating it, in its unsevered condition, as personalty, and transferring title accordingly.— *Clark* vs. *Way*, 11 Rich., 624.

These propositions are not disputed by *Lord Mountjoy's* case, nor by any of the English or American cases following its authority; but, on the other hand, are supported by many cases of undoubted authority.

To all such contracts and grants, whether relating to realty or personalty, the test that has been applied, is the intent of the parties. The difference between the two cases is this: that certain words sufficient to manifest such intent, in the case of personalty, are not deemed sufficient for that purpose in the case of realty.

The proper conclusion from these cases would seem to be, that grants of a right to enter the lands of the grantor and sever therefrom and appropriate its products or mineral contents, are subject to a presumption not applicable to the case of a sale of personalty, that the grantor did not intend to exclude his own proprietary right to a concurrent enjoyment with the licensee of the power granted. If this view is correct, any words evidencing an intent on the part of the grantor to part with his proprietary rights over the subject-matter to which the grant relates, would rebut such presumption. What force, then, should be given to words tending to evidence an intent on the part of the grantor to exclude himself from the enjoyment concurrently with the grantee of the right conferred ? So far as the existence of such a presumption bears on the question, the obvious answer is, that the same force should be given to the expressions employed that would be given had the subject-matter been other than realty. The presumption, indeed, demands some positive evidence of an exclusive intent, but does not influence the force of the evidence of such intent.

If the foregoing propositions flow from the principles of law, and are compatible with the adjudicated cases, then we have a clear rule to govern us in seeking the construction of the grant in question.

We have only to ask what the parties had in contemplation as the right intended to be created, giving to the terms, or expressions employed by them in a technical sense, that technical force and effect conferred upon them by the adjudicated cases entitled to have weight as authority. We have now to look into the current of decisions to verify the grounds of our conclusions ; but that we may the better understand their bearing and force, it is proper to observe some of

the features in the various instruments which have received judicial construction as bearing on the question of intent.

In all the grants of mining rights, from the earliest reported cases down to the present time, there is a striking similarity in the terms used to describe the character of the rights intended to be conferred. It is described, substantially, as a right to enter certain designated premises, and to search for minerals, to mine or work them, appropriate and sell them. In some cases the premises may be used for manufacture only to the extent of preparing the raw material for use or sale; in other cases, like the case in hand, the right to use the premises for the purpose of manufacture is unlimited, as to the nature and extent of the manufacturing powers. The right uniformly embraces authority to go upon the land of another, and perform there certain acts which could only be justified under authority, derived from the owner, of severing from the land certain portions of the body of the land, so as to become personal property, and appropriating the same as against the right of the owner and all other persons.

Such a right may exist perfect in the hands of a grantee, and yet not exclude the right of the grantor or owner to take from the land like substances, for his own use, so that he does not obstruct or impede such operations as the grantee may have set on foot, in virtue of his grant.

Although the right to mine in the lands of the grantor, may extend to all minerals, or to all of a given class, yet that does not exclude the grantor from appropriating minerals of that description, provided he does not obstruct the operations of the grantee. In a word, the possession of a right to go upon the lands of another to search for, sever, remove and appropriate any or all minerals, or any or all of a given class, does not exclude the owner of the land from taking to his own use, minerals of the same character and class from the premises embraced in the grant. Nor does the fact that such right is, by the terms of the grant, an assignable interest in the hands of such grantee, operate to the exclusion of the grantor.

When, however, the grant evidences an intent to exclude the grantor, such intent provides whether the grant extends to all mineral substances, or to all of one or more classes.

There are three modes in which the intent to exclude the grantor has been expressed: first, by terms importing a sale and conveyance of the minerals, as such, in which case the grantor's right is ex-

cluded, by a necessary implication, from the possession of full pro-
prietary right on the part of the grantee; second, by words of con-
veyance, conferring on the grantee exclusive power over the subject-
matter of the grant; and, third, by provisions excluding the grantor
from the performance of acts appropriate to him as owner of the
land, where the effect of such exclusion is to leave unlimited con-
trol in the grantee of all materials to which the mining right re-
lates.

An intent to exclude the grantor, though not expressed in the
body of the deed, may be implied from the nature of the considera-
tion. The fact that the grantee is bound to pay for the substances ap-
propriated by him according to the quantity realized, at an agreed
rate, whether in kind or in money, does not, of itself, disclose an
intent to exclude the grantor. But if the consideration appears to
include a value fixed by the parties on the whole mineral deposit,
and is demandable absolutely under the contract, without depending
on the value of the actual result from the mining operations of the
grantee, the grant is regarded as a sale of the mineral, and, as to
it, the grantor is excluded.

We will now look into the cases, in order to verify the deduc-
tions from them already stated.

*Lord Mountjoy's* case (Co. Lit., 165,) determines that a reserva-
tion of the right to take minerals and turf, although existing as
an assignable and heritable interest, does not necessarily exclude
the owner of the land. In that case, there were no words express-
ive of an intent to exclude the owner of the land, independent of
the nature of the thing reserved. It is true, the reservation must
be regarded as made upon consideration, but the consideration,
whatever it may have been, was not in a form enabling the Court
to conclude that, in fixing that consideration, the parties had acted
upon a real or assumed valuation of all the materials subject to
appropriation under the terms of the reservation.

The authority of this case has been recognized in this State, in
*Clark* vs. *Way*, 11 Rich., 624; in Pennsylvania, in *Caldwell* vs.
*Fulton*, 31 Penn., 624, and *Funk* vs. *Haldeman*, 53 Penn., 229.

*Wilson* vs. *McKreth* (3 Burr., 1824,) holds that one may have, as
against the owner of the land, an exclusive right to take the turf.
It is worthy of notice that, from all that appears in that case, the
right of the plaintiff may have been limited to so much as he
should require for a particular use. The question of exclusiveness
was not treated in that case as at all dependent on the question,

whether, in its nature, the right conferred was corporeal or incorpo-- real, but wholly on the terms of the grant or prescription under which it was claimed.

*Chitham* vs. *Williamson* (4 East., 469,) followed *Lord Mountjoy's* case. Lord Ellenborough says, in that case, "no case can be named where one who has only a liberty of digging for coals in another's soil, has an exclusive right to the coals, so as to enable him to maintain trover against the owner of the estate for coals raised by him." This is far from saying, that such an exclusive right cannot be created by the use of suitable language in the grant. It is only authority for saying, that exclusion will not be implied from the naked fact of a grant of that nature.

*Doe* vs. *Wood* (2 Barn. & Ald., 724,) contained nothing to take it out of *Lord Mountjoy's* case.

The question was, whether the grant operated as a demise or a license merely. The discussion of the question by Abbott, C. J., shows, that the question of exclusiveness, as settled by the language and intent of the grant, was regarded as laying at the foundation of the question, whether the instrument could take effect as a demise. It was not in terms a demise, and could only be made to operate as such, when the right intended to be conferred was of such a nature as to be the proper subject of a demise. The consideration of that grant tended rather to strengthen than rebut the presumption, that the grantor did not intend to divest himself of the entire property of the minerals, for, instead of its being an entire sum, including the value of all materials subject to appropriation under it, it was a reservation of a share of the minerals, as such. The idea of a grant, operating as a sale or demise of the minerals themselves, is distinctly recognized, and the case before the Court distinguished from one resting on a grant of that nature.

It is fairly inferable from the case, that had the grant conferred an exclusive right of mining for a term of years, it would have been regarded a demise, although the subject-matter was not an opened mine, but merely minerals contained in the land. This proposition is as distinctly recognized as it could well be, without being directly ruled by the decision.

*Muskett* vs. *Hill*, 2 Bering., N. C., 694, while adhering to *Doe* vs. *Wood*, goes a step further, holding, under a grant closely resembling that in *Doe* vs. *Wood*, that a license of that character could operate as a grant in respect of minerals taken under its authority, and

therefore constituted an assignable interest in the hands of the licensee. *Clark* vs. *Way*, 11 Rich., 624, applied the principles of *Lord Mountjoy's* case to the case of a right to take timber in the land of another. The applicability is put distinctly on the ground that the grant contained no words of exclusion. *Caldwell* vs. *Fulton*, 31 Penn., 475, is a leading Pennsylvania case bearing on this question. The adjudications of the Courts of that State, in this branch of the law, are entitled to great consideration, both for the extent and value of the mining operations that have been affected by such adjudications, and for the great learning and experience of the Judges from which they have emanated. Apart from the nature of the consideration of the grant in *Caldwell* vs. *Fulton*, it was distinctly ruled by *Lord Mountjoy's* case. Judge Woodward, who delivered the opinion of the Court in a previous case between the same parties, both in that case, and in *Funk* vs. *Haldeman*, 53 Penn., 229, recognized the authority of *Lord Mountjoy's* case, as reported by Lord Coke, under the weight of authority that had, both in the English and American Courts, sanctioned its rulings, but held that the grant then under consideration was to be regarded as a sale, for a valuable consideration, of the absolute and exclusive right to all the coal under the grantor's land. The opinion in the recent case reported in 31 Penn., 475, was delivered by Judge Strong. This opinion does not so distinctly appear to place the decision on the ground of the nature of the consideration paid, but that such was the turning point of the case distinctly appears in *Clement* vs. *Youngman*, where the same Judge states the point decided in *Caldwell* vs. *Fulton*. *Clement* vs. *Youngman*, 40 Penn., 341, contains this important expression : "In *Caldwell* vs. *Fulton* we held that a grant of an unlimited right, title and privilege to dig and take away the coal, in a designated tract of land, to any extent the grantee might think proper, and for a consideration, presently paid, was a grant of the coal itself, and not merely a license or incorporeal right." To this view of *Caldwell* vs. *Fulton*, the Court declares itself as adhering. The grant in that case related to two distinct kinds of material to be found on the premises, namely, iron and limestone. The Court held that the agreement was not intended by the parties to confer an absolute right to either the ore or the limestone, on the ground that, as it regards the ore, the only consideration stated was an agreement to pay for the amount of ore actually taken, and as to the limestone, no consideration of any kind was stipulated for, besides the limestone was only to be taken to be used in the manu-

facture of iron from the ore. This case is in entire harmony with *Lord Mountjoy's* case, and is distinguishable from *Caldwell* vs. *Fulton* by the fact that there was no consideration stipulated for, that implied a sale of all the minerals of the designated kinds on the premises. It holds that an agreement to pay a stipulated price for the minerals actually taken, estimated upon the quantity taken, is not such a consideration as implies a sale of the whole mineral content. In this last respect the case resembles *Doe* vs. *Wood*, with the exception, that the consideration stipulated for, in that case, was a share of the minerals, instead of a fixed equivalent in money. This case treats the question as to whether the right granted is corporeal as depending upon the intention of the parties as to its exclusiveness, as derived from all parts of the instrument construed together.

*Glonninger* vs. *Franklin Coal Co.*, 55 Penn., 7. The grant in this case was held not to be exclusive on two grounds: first, the consideration was a merely nominal sum ($6.50); and, second, the right to take coal was limited to the amount required by the grantee for his use as a blacksmith. In construing that part of the grant that operated to limit the amount to be taken, the Court took into account the state of knowledge, as to the value of coal, and its uses at the time of making the contract.

*Graves* vs. *Hodges*, 55 Penn., 564, holds that an agreement to pay a stipulated price per ton for ore taken, does not import an exclusive privilege. *Grubb* vs. *Bayard*, 2 Wall., Jr., 81, where the consideration was also an amount stipulated to be paid per ton for the mineral taken, holds that the grant was not exclusive. Thus we find, in cases entitled to weight as authority, the proposition that when the grantee has unlimited authority over the subject-matter of the grant, a consideration consisting of an entire sum, including the valuation fixed by the parties upon the whole mineral content of the land, or of the class of minerals to which the mining right relates, demandable absolutely under the contract, furnishes evidence of an intent to confer an exclusive right on the grantee. On the other hand, the proposition is not disputed by any of the cases regarded as of leading authority on this subject.

This conclusion appears entirely reasonable. No presumption of an intent to reserve any part of the thing granted ought to prevail against ground of reasonable inference, that the price received by the grantor is an equivalent for the whole thing granted. Certainly in equity such a presumption could not be allowed to prevail over the manifest equity disclosed by the nature of the consideration.

We are not called upon in this case to decide that the fact of such a consideration, standing by itself, is sufficient to characterize the contract as intending an exclusive right, but as in the present case there are other evidences of such intent, we are only required to hold that the existence of such a consideration tends to establish an exclusive intent. We hold, therefore, that the grant to the defendant Moses was intended to, and did in fact, exclude the grantor, Massot, from all right to appropriate to himself any of the mineral substance to which the grant relates during the term of the contract, and from conferring such right upon any other person, as against the grantee or those of right claiming under the grant.

Had Moses' right been unlimited as to time, the grant would have operated as an absolute sale and conveyance of the mineral itself, as in the case of *Caldwell* vs. *Fulton*. The limitation of the right to ten years prevents it from having this effect, but does not change the character of the grantee's authority during that period, such authority being that due to a full proprietorship of the minerals during the term. The words " sell and convey " cannot have their full effect, in consequence of the limitation in point of time, but in conjunction with other expressions of the grant, they serve to fix the character of the grantee's power and right, as a full proprietorship, during such term. This conclusion is not affected by the limitation imposed, as to the extent of the surface to be worked at any given time, as that limitation does not impair the right to work the whole, but limits the use of the surface of the ground as an incident to the operation of searching for and removing the minerals.

It is clear that the grant operated as a demise of the minerals for the term of ten years, and, therefore, the interest of the grantee was divisible.

Three things are necessary to a demise ; first, a proper subject-matter; second, possession for a term of years: and, third, a right to the profits during such term. The argument in behalf of the plaintiff is, that the powers conferred by the grant does not relate to any thing corporeal, of which possession may be had. If this conclusion be established, it would result, as contended for by the plaintiff, that the power being incorporeal, it was indivisible, and the defendant, having attempted to divide it, had destroyed it.

The answer to this argument is supplied by the authorities, as well as by the reason of the case. The law of England, on this subject, is stated by Mr. Bainbridge, in his work on the Law of Mines and Minerals, 163. He states that minerals contained in the land,

although unopened, as well as opened mines, are capable of forming " a distinct possession or inheritance," and that if it was requisite that livery of seizin should be made of them, still they are susceptible of such livery. That author does not cite the authority of adjudicated cases to these propositions, as fully as might be expected. It is, however, not unlikely that this view of the law, so distinctly shadowed forth in *Doe* vs. *Wood*, 2 Barn. & Ald., 924, should have been practically acted upon without further controversy.

In *Doe* vs. *Wood*, the question was whether ejectment would lie in the case of unopened mines, by one having the right to mine, though not entitled as owner or lessee of the land. If property of that kind had been incapable of sustaining a possessory title, the answer to the action would have been complete without any further enquiry, in order to ascertain the intention of the parties to the grant. The fact that the Court regarded it as important to ascertain whether the parties intended it as a demise, shows, conclusively, that it was capable of acting as a demise, if the parties so intended. This case leaves no doubt as to how the law of England stood, and if no other authority for so doing existed, Mr. Bainbridge would have been justified in stating, in the manner in which he has stated it, the law of that country.

*Caldwell* vs. *Fulton*, 31 Penn., 475, holds that, by the law of Pennsylvania, minerals unsevered, are land, capable of being held and transferred, apart from the ownership of the land.

This determination necessarily involved the idea, that a possessory title could be had " in minerals in place," and, therefore, we should infer that a grant or conveyance, intended by the parties to operate as a transfer of property of that character, for a term of years, accompanied by an exclusive enjoyment of the profits thereof, would create a demise. There are, however, expressions in *Caldwell* vs. *Fulton*, and *Clement* vs. *Youngman*, that involve this deduction in some perplexity, as it regards the effect of the Pennsylvania cases. In these cases stress was laid on the fact that the right of the grantee was wholly unlimited in respect of time, quantity and use. It is not difficult to see the bearing of that fact in *Caldwell* vs. *Fulton*, for there the conclusion that the grant operated to exclude the grantor rested on the fact that the parties intended a sale and conveyance. It was important to show that the entire interest in the coal was transferred. But it would not seem to follow that there was no other mode by which the grantor could have conferred an exclusive right on the grantee, than by

making an instrument that was capable of operating as a sale and conveyance absolute of the whole content of coal.

The difficulty as to the construction intended by the Pennsylvania cases arises from expressions employed in the opinions. The opinion of Judge Woodward, reported in 31 Penn., 475, is clear upon this point. He sought to rest the case upon the inferences arising out of the consideration. From the consideration he inferred a contract of sale of the whole content of coal. His language is, " he sold for a valuable consideration all he had in sixteen acres, and all the coal in his other land. I say all, because the grant is limited to no time or quantity or purpose or person." The absence of a limitation as to time is here referred to as defining *how much* was sold, and not for the reason that such a limitation would be necessarily decisive against the grant operating as exclusive against the grantor.

Judge Strong, in the opinion in the second case that arose between the parties to *Caldwell* vs. *Fulton*, sought to place the right of the grantee on quite different ground from that previously taken by Judge Woodward. His theory of the case, started with the proposition that " minerals in place " were land, and might be transferred as such. He then lays down the principle, that a conveyance of the whole profit of land is a conveyance of the land itself. In order to apply these principles to the case in hand, it was requisite to show two things: first, that coal was a profit of land ; and, second, that the grantee acquired a right to the whole profit of coal. In answering the objection that coal being but part of the profit of the land, the principle could not be applied, he holds that the subject of the grant being coal, the whole usufruct and dominion were granted. In other words, coal in place was, in itself, land, and might be conveyed as such. It is difficult to understand why, if coal is land, it should be necessary to treat it as merely a profit of land. According to this view a sale of coal was a sale of land *eo nomine*. Why, then, resort to a principle which is only important when the land, as such, is not conveyed? To the operation of this principle he ascribes the conclusion in *Lord Mountjoy's* case, *Cheatham* vs. *Williamson, Doe* vs. *Wood* and *Grubb* vs. *Bayard.*

An examination of the cases last mentioned will show that the idea that a conveyance of the profit of land is a conveyance of the land, did not enter into the grounds of decision in those cases. Of *Lord Mountjoy's* case, Judge Strong says that the grant was of " only sufficient for a single specified purpose, viz: the manufacture of

alum and copperas." And thus it was not in conflict. In other words, if the right in that case had not been subject to that particular limitation, it would have been held to exclude the grantor. It is far from clear that the grant in *Lord Mountjoy's* case, so far as it related to ores, was subject to the limitation that clearly applied to the turf; at all events, that solution was not indicated in the case as reported.

It is very clear that Lord Ellenborough did not so understand *Lord Mountjoy's* case, when, in *Cheatham* vs. *Williamson*, he deduced from that case the proposition, that one having a liberty of digging for coals in another's land, has not an exclusive right to the coals, as against the owner of the soil. Had the grant in *Lord Mountjoy's* case been unlimited, as to the purpose for which the grantee should take the turf or minerals, it still would have been only "a liberty of digging" in another's soil, and the remark of Lord Ellenborough would be equally applicable to the case.

The comment made by Judge Strong, on *Cheatham* vs. *Williamson*, that that case was decided upon the idea that livery of seizin was indispensable, does not appear to be sustained by the report of that case in 4 East. Lawrence, J., says " the covenant, therefore, can only operate as a grant, but will not pass the land itself without livery."

The allusion to the want of livery arose from the fact that E. Hyde was only the owner of the equity of redemption, and had not the legal estate in him, and as the right to mine was reserved in his deed, it was necessarily unaccompanied by livery, for E. Hyde, not having the legal estate, could not make livery. The remark of Lawrence, J., if entitled to be regarded as disclosing the point of the case, falls far short of making the assertion that such an interest as an exclusive grant would have created was incapable of being attended by livery.

Judge Strong's comment on *Doe* vs. *Wood*, (2 Burr. and Ald., 719,) fails to elicit the full import of that case. It was not the fact that the grant was limited to a term of twenty-one years, that was the ground of holding it a license. The question was whether it was a demise or license. If a demise, it would be the limitation of a term of years that would make it such. That, of course, then, was not the turning point as between a demise and a license. Abbott, C. J., states the question as follows : " One of the questions was whether this indenture operated as a demise of the metals and minerals, so as to vest in the lessee a legal estate therein, during the term, upon the condition mentioned, or only a license to work and

13

get the metals and minerals that might be found within the limits described." Here is a clear conclusion that a legal estate in the mines and minerals might be created for a term of years, and so far as to operate as a demise. The question was, then, had the parties done so? The conclusion of the Court was, that by the terms of the grant the grantee did not take a present interest in the minerals as proprietor, but that his proprietary right arose only when the minerals were severed from the land. It will be borne in mind, that in that case the grantor retained an interest in the minerals themselves in the form of a share of all minerals raised. That decision clearly rests on the idea that the grant was not exclusive, because it was nothing more than a liberty to dig for minerals in the land of another. Had there been anything in the granting part of the deed, or in the consideration, showing that the parties intended it to be exclusive, it is clear that it would have been upheld as a demise. This shows clearly that the limitation, as to time, was not the turning point in the case. That case professed to follow *Lord Mountjoy's* case, and we are at liberty to conclude that the construction put upon the grant was the result of the principle settled in that case. This view seems to strengthen the idea that has already been advanced in regard to *Lord Mountjoy's* case, that the Court allowed a presumption, in the absence of words of exclusion, that the grantor did not intend to divest himself of his proprietary right as owner of the land, but to admit the grantee to a participation in certain of those rights. The conclusion of Judge Strong is summed up in these words: " When the intent is to give the entire usufruct, and power of disposal, the legal title must be held to pass." Standing by itself, this proposition is not controverted, nor was it necessary to go beyond the mere affirmation of that proposition in *Caldwell* vs. *Fulton.* But it does not follow that because the entire usufruct and power are limited to a term of years, that a legal estate by way of demise will not pass. It will be observed that Judge Strong speaks of "the entire usufruct and power of disposal." There is a well defined distinction between a deed of the usufruct and the power of disposal as it regards its competency as an actual conveyance of the land to which it relates. A deed of the usufruct of land can only convey the land itself under the operation of a rule of construction enlarging the terms of the deed beyond their direct import, on the principle of implication. Not so in the case of a deed conveying the " power of disposal," when such a conveyance is made for the use and enjoyment of the grantee.

In the latter case, the subject of the grant is dominion over the land. All that a deed purporting to convey the land, specifically, can pass, is the dominion over the land.

The deed does not affect the physical attributes of the land, or confer on it any quality fitting it to become subject to the dominion of the new owner. It simply transfers to the grantee what the grantor previously possessed. "Power of disposal is dominion over the land."

When, therefore, the deed conveys both the usufruct and power of disposal, it is unnecessary to resort to the rule, that conveyance of the whole usufruct is the conveyance of the land itself, for the deed acts at once, by a principle of interpretation within itself, as a conveyance of the land.

Regarding coal as land, the deed in *Caldwell* vs. *Fulton* did not merely convey the usufruct of land, but conveyed complete and absolute power of control over land, for the use and enjoyment of the grantee.

For the same reason, had that deed conveyed the same power of control and disposal for a term of years, it would have created a demise. It is quite evident, from the summary already quoted, as made in *Clement* vs. *Youngman* as to the point ruled in *Caldwell* vs. *Fulton*, that the Court, on mature consideration, was disposed to adhere to the conclusion that the true point of distinction between that case and *Lord Mountjoy's* case, was the difference in the inferences to be drawn from the considerations of the respective grants.

No one disputes the validity of a lease of opened mines, nor that such a lease covers the stratum or vein of minerals, so far as embraced within the lands described, and is not limited to the openings, which are merely conveniences for getting access to the mineral, nor to the superficial occupation of the ground.

Extensive workings may serve to develope the value of a stratum or vein of mineral, but are not essential to complete the legal idea of property in such substances.

The legal conception of land is that of a right, within the limits of law, to control some part of the earth embracing its surface and content.

In general, conveyancing deals only with the surface of the ground, and, accordingly, we have come to consider surveyors' lines as the true boundaries of property. If we find difficulty in conceiving of the ownership of a vein of mineral as land, it probably

arises from the fact that we cannot conceive of the outlines of such property being traced by surveyors' lines. But this is a mere superficial idea of land. A man's possessions, as the owner of land, is a solid body of rock, soil and water, bounded by planes instead of lines. There is no good reason why he should not, if he chooses, divide his possessions with those who can make a more advantageous use of it than he can make, by horizontal planes, or oblique planes, so long as the law can comprehend and effectuate his purpose.

Such is the practice of mankind, and it is due to the practice of the law that its ideas should keep pace with the habits and usages of practical life.

The notion of accessibility forms no part of the idea of land, yet the difficulty that arises in attempting to form a legal conception of a vein of mineral as land, springs from the idea of its inaccessibility. As it regards livery of seizin, it is not, now-a-days, a question whether the owner of the soil can reach it, in order to perfect a symbolical delivery, but whether the statute of uses can reach it so as to give effect to a deed of bargain and sale.

The interest of Moses being a demise, it was competent for him to divide it, and, therefore, the ground of the bill fails, and it must be dismissed with cost.

*Moses,* C. J., and *Wright,* A. J., concurred.